1

2

3

4

5

6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7

RICHARD SCOTT GOLDSMITH,

8

Plaintiff,

9

v.

10

SNOHOMISH COUNTY, et al.,

11

Defendants.

12

No. C07-0203-MJP

ORDER ON DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT

13

14        This matter comes before the Court on Defendants' motion for summary judgment.  (Dkt. No.

15   27)  Having considered Defendants' motion and reply (Dkt. No. 38), the declarations attached to

16   Defendants' motion and reply (Dkt. Nos. 28-33, 39-40), Plaintiff's response and declarations (Dkt.

17   No. 37), the complaint (Dkt. No. 6-2), and the balance of the record, the Court GRANTS Defendants'

18   motion for summary judgment.

19                                          **Background**

20        On April 7, 2006, Richard Scott Goldsmith ("Plaintiff") was entertaining a friend, Michael

21   Wilson, at his apartment, when Plaintiff began to feel anxious and upset.  Plaintiff told Wilson that he

22   thought he was going to have a panic attack.  (Goldsmith Decl., Dkt. No. 37-7, at 2)  He feared the

23   prescription medication he had taken earlier for his anxiety disorder was not working.  Plaintiff told

24   Wilson that he thought his medication was causing him to have a heart attack or stroke.  (Kahler

25

Decl., Dkt. No. 29, at ¶ 14).  Plaintiff went to the bathroom.  Wilson heard a loud "bang from inside the bathroom" and found Plaintiff on his back lying against the tub.  (Wilson Decl., Dkt. No. 37-9, at 2).  Wilson unsuccessfully tried to raise Plaintiff up, and noted that he had "blood coming out of his nose" and that "a lot of blood was coming out of his mouth."  Id.  Plaintiff became combative with Wilson and attempted to fight him.  Id.  Wilson called 911 for emergency medical assistance.

A Snohomish County Firefighter Paramedic and Emergency Medical arrived at Plaintiff's residence.  Paramedic, Jason Isotalo, located Plaintiff in the small bathroom and noted that he was "moaning and groaning on the floor with his eyes closed and blood coming from his mouth."  (Isotalo Decl., Dkt. No. 32, at ¶ 8)  Isotalo asked Plaintiff to consent to treatment, but Plaintiff did not respond, became "very agitated," and would not allow the medical team to touch him.  (Id.)  He "exhibited bizarre behavior."  (Id.)  Isotalo could not identify a specific medical problem.  (Id. at ¶ 9)[1]

Isotalo became fearful for his "safety and the safety of [his] partner" when Plaintiff, a large man with blood around his nose and mouth, jumped to his feet in the small bathroom.  (Isotalo Decl. at ¶¶ 6, 8)  Plaintiff lunged at Isotalo with his shoulder.  (Id. at ¶ 10)  Isotalo then radioed a "Code" request for assistance from the Snohomish County Sheriff's Office, the first time he has had to do so in his 15-year career.  (Id.)  It is the policy of the Snohomish County Fire District to request "Code" backup from the Sheriff to subdue a violent patient.  (Id. at 12)  Plaintiff then "fell backwards into the [bath]tub and quickly jumped back onto his feet a second time."  (Id. at ¶ 11)  Isotalo was unable to provide medical assistance.

Snohomish County Sheriff's Deputy William Dawson was the first to respond to the Code call.  (Dawson Decl., Dkt. No. 31, at ¶¶ 1, 5-7)  Dawson heard loud yelling from the apartment and followed the medical personnel to the bathroom.  (Id. at ¶¶ 7-8)  Dawson noted that Plaintiff was

---

[1]Plaintiff has no memory of the events that took place after he left Wilson to go to the bathroom.  There is no other testimony as to what went on except for the declarations and depositions of County personnel (Mr. Wilson's declaration does not describe any details of events after the paramedics arrived).

"wide-eyed, screaming incoherently, profusely sweating, with blood on his face." (Id. at ¶ 9)  Plaintiff would not respond to questions.  (Id.)  Dawson's attempts to calm Plaintiff down were useless.  (Id. at ¶ 10)  In response to Dawson's presence, Plaintiff "assumed a fighting stance" and "reached out to grab the metal towel bar mounted on the wall of the bathroom" in an apparent attempt to "arm himself with the metal bar." (Id. at ¶ 11)  Dawson tried to stop Plaintiff from grabbing the bar.  Deputy Andrew Kahler arrived on scene and observed Dawson's attempt to calm Plaintiff and to stop Plaintiff from using the towel bar.  (Kahler Decl. at ¶¶ 6-7)[2]  Kahler also attempted to grab Plaintiff's arm. (Id.)  Dawson radioed for assistance.  (Id. at ¶ 12)

Dawson next tried to take hold of Plaintiff's left forearm and remove him from the small bathroom.  (Dawson Decl. at ¶ 13)  Plaintiff struggled against Dawson.  Dawson believed he and Plaintiff could get hurt.  (Id.)  Dawson, who is trained to use a Taser, shot two barbs from his Taser into Plaintiff's abdomen.  (Id.)  The Taser had "little to no effect" on Plaintiff, who "immediately pulled the barbs out of his abdomen." (Id.)

Together, Dawson and Kahler attempted to move Plaintiff out of the bathroom and into the hallway where there was more room.  (Dawson Decl. at ¶ 15)  Dawson again deployed two barbs from his Taser into Plaintiff, this time striking Plaintiff's back.  (Id.)  This was "momentarily effective" and Kahler used a "two-hand hair hold" to move Plaintiff into the hallway.  (Id.; Kahler Decl. at ¶ 10) Kahler placed Plaintiff on his stomach.  (Kahler Decl. at ¶ 11)  However, Plaintiff quickly resumed fighting the deputies.

Dawson applied the Taser a third time to Plaintiff, this time using the "Drive Stun" mode, which "directs the immobilization operation of the Taser directly onto the muscle group on which it is applied." (Dawson Decl. at ¶ 16)  This had no effect on Plaintiff and Dawson threw the Taser out of reach.

---

[2]Dawson states that he was not aware when the other deputies arrived.  (Dawson Decl. at ¶ 14)

1    The two deputies struggled to subdue Plaintiff who was lying face down on top of his arms.

2    (Dawson Decl. at ¶ 16)  Kahler and Dawson were unable to handcuff him.  Kahler then punched

3    Plaintiff's arm several times "in an attempt to get him to relent" and to handcuff him.  (Kahler Decl. at

4    ¶ 11)  This had no effect.  (Id.)  Deputy Michael Vafeados arrived during this struggle and helped

5    restrain Plaintiff by using his left knee and body to force Plaintiff onto the ground.  (Vafeados Decl.,

6    Dkt. No. 28, at ¶ 7)  Vafeados employed a "pain compliance technique to [Plaintiff's] wrist" and

7    helped Dawson place Plaintiff in handcuffs.  (Id.; Kahler Decl. at ¶ 11)  All three deputies state that

8    they never placed Plaintiff under arrest.

9    Kahler placed his knee between Plaintiff's shoulder blades in order to keep him face down and

10    to permit Dawson to place a hobble restraint on Plaintiff's legs.  (Kahler Decl. at ¶ 12)  It appears both

11    Kahler and Vafeados used their bodies to keep Plaintiff down on the ground.  Kahler noticed that

12    Plaintiff ceased struggling as Dawson worked to place the leg hobbles on Plaintiff.  Kahler states that

13    Plaintiff "was pale, his eyes were closed and it appeared he was no longer breathing."  (Id.)  Plaintiff

14    suffered a heart attack.  The medical crew at the apartment took over care immediately.  When

15    Plaintiff stopped breathing there were six members of the Fire District present.  (Isotalo Decl. at ¶ 17)

16    The medical team intubated the Plaintiff and noted that his heart returned to beating spontaneously.

17    He was then taken to the emergency room. (Id. at ¶ 18)

18    Plaintiff filed suit against the three Snohomish County Sheriff's Deputies and Snohomish

19    County (collectively, "Defendants") for harm he allegedly suffered related to the emergency medical

20    request on April 7, 2006.  Plaintiff originally filed suit in Snohomish County Superior Court, alleging

21    fourteen causes of action under state tort law and 42 U.S.C. § 1983.  (Compl., Dkt. No. 6-2)  He

22    alleged several violations of the Fourth Amendment and Fourteenth Amendment actionable under 42

23    U.S.C. § 1983.  He also alleged several state tort law claims: negligence, assault and battery, outrage,

24    negligent infliction of emotional distress, failure to train, supervise, or instruct, false arrest, and false

25    imprisonment.  (Compl.)  On February 7, 2007, Defendants filed a notice of removal in light of

1    Plaintiff's constitutional and civil rights claims.  (Defs. Not. of Removal, Dkt. No. 1).  This Court has

2    removal jurisdiction pursuant to 28 U.S.C. § 1441, with original jurisdiction over Plaintiff's § 1983

3    claims and supplemental jurisdiction over his state law tort claims.  <u>See</u> 28 U.S.C. §§ 1331, 1343,

4    1367(a).

5        Defendants moved for summary judgment on all of Plaintiff's claims on November 16, 2007.

6                                                **Discussion**

7    **A.  Standard of Review**

8        At summary judgment, the moving party bears the burden to "show that there is no genuine

9    issue as to any material fact and that [it] is entitled to judgment as a matter of law."  Fed. R. Civ. P.

10   56(c).  This Court must construe the facts in the light most favorable to the non-moving party.  <u>Id</u>.  A

11   material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the

12   nonmoving party."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

13   **B.  Qualified Immunity**

14       Plaintiff contends that Defendants violated 42 U.S.C. § 1983 by violating: (1) the Fourth

15   Amendment's protection against excessive force, (2) the Fourth Amendment's protection against

16   unlawful arrest, and (3) the Fourteenth Amendment's guarantee of due process.  Defendants respond

17   that the deputies and County are entitled to qualified immunity from all of Plaintiff's § 1983 claims.  In

18   the absence of any genuine issues of material fact, Defendants are entitled to qualified immunity.

19       Qualified immunity exempts government officers from liability when their actions do not

20   violate "clearly established statutory or constitutional rights of which a reasonable person would have

21   known."  <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982); <u>see</u> <u>Saucier v. Katz</u>, 533 U.S. 194, 200-01

22   (2001) (qualified immunity is an immunity from suit).  <u>Saucier</u> established a two-step analysis of

23   qualified immunity.  First, the Court must determine whether "the officer's conduct violate[d] a

24   constitutional right."  <u>Jackson v. City of Bremerton</u>, 268 F.3d 646, 651 (9th Cir. 2001) (citing <u>Saucier</u>,

25   533 U.S. at 201).  Second, if a constitutional right is violated, then the Court must determine "whether

1    the officer could nevertheless have reasonably but mistakenly believed that his or her conduct did not

2    violate a clearly established constitutional right." Id.; Saucier, 533 U.S. at 201-05.  At step two,

3    immunity attaches if the officer was reasonably mistaken and/or if the constitutional right was not

4    clearly established.

5        **1.  Excessive Force**

6        Plaintiff argues that the use of the Taser, punches, pain-compliance techniques, handcuffs,

7    hobbles, and pressure on his back was unconstitutional and an excessive use of force.  Defendants

8    respond that the deputies did not violate Plaintiff's Fourth Amendment rights and are therefore entitled

9    to qualified immunity.  The Court finds that the Defendants are entitled to qualified immunity, having

10   not violated Plaintiff's constitutional rights.  See Saucier, 533 U.S. at 201.

11       The Fourth Amendment protects individuals against excessive use of force from government

12   officials.  See U.S. Const. amend. IV; Jackson, 268 F.3d at 651.  Yet, if an officer's use of force is

13   "objectively reasonable" under the circumstances, there is no constitutional violation.  Graham v.

14   Connor, 490 U.S. 386, 397.  The reasonableness of an arrest or seizure must "be assessed by carefully

15   considering the objective facts and circumstances that confronted the arresting officer or officers."

16   Chew v. Gates, 27 F.3d 1432, 1440 (9th Cir. 1994) (citing Graham, 490 U.S. at 396).  This Court

17   must judge the reasonableness "from the perspective of a reasonable officer on the scene, rather than

18   with the 20/20 vision of hindsight." Graham, 490 U.S. at 396 (citation omitted).  This Court may

19   decide as a matter of law whether the quantum of force used was reasonable.  Jackson, 268 F.3d at

20   651 n.1.

21       In determining the objective reasonableness of the force used, the Court must balance "the

22   nature and quality of the intrusion on the individual's Fourth Amendment interests" against the

23   "countervailing government interests at stake." Graham, 490 U.S. at 396 (internal quotations omitted).

24   First, the Court must "evaluate the type and amount of force inflicted" in order to "assess the gravity

25   of a particular intrusion on Fourth Amendment rights." Chew, 27 F.3d at 1440.  Second, the Court

1  must consider the governmental interest in a three-step analysis of: (1) the severity of the crime at

2  issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3)

3  whether the suspect is actively resisting arrest or attempting to evade arrest by flight.  Graham, 490

4  U.S. at 396.  The second factor is the most important.  Chew, 27 F.3d at 1441.  The Ninth Circuit has

5  also suggested that "the availability of alternative methods of capturing or subduing a suspect may be a

6  factor to consider" in this balancing test.  Id. at 1441 n.5.  However, these factors "are not to be

7  considered in a vacuum . . . ."  Id. at 1441.

8      In Tatum v. City and County of San Francisco, the Ninth Circuit held that a police officer's use

9  of force prior to an arrest was objectively reasonable, even though the plaintiff died during the arrest.

10  441 F.3d 1090, 1095-1100 (9th Cir. 2006).  The facts of Tatum are relevant here.  In Tatum, the

11  officer asked the plaintiff, who was high on cocaine, to present identification and to cease kicking a

12  police station door.  The plaintiff did not respond and evaded arrest when the officer tried to place him

13  in handcuffs.  Several officers arrived to help arrest the plaintiff.  The officers kept the plaintiff on his

14  stomach with his face on the ground.  The officers had him face down for only a minute or so before

15  positioning him on his side.   The plaintiff's heart stopped and he died of cocaine toxicity.  Id. at 1093.

16  The Ninth Circuit held that the officers' use of force to arrest the plaintiff was objectively reasonable,

17  despite the minimal severity of the crime and the plaintiff's death.  Id. at 1096.  The court emphasized

18  that the officers' use of force was necessary to stop the plaintiff from fleeing and from harming himself

19  and others.  Id.

20      The Ninth Circuit has found more aggressive police conduct than that in Tatum to be

21  objectively reasonable.  In Jackson, the court held that spraying the plaintiff with a chemical irritant

22  prior to her arrest for failure to disburse, pushing her to the ground to handcuff her, roughly pulling

23  her to her feet to arrest her, and placing her in a hot police car was not excessive force.  268 F.3d 646,

24  652-53.  In Johnson v. County of Los Angeles, the court held that hard pulling and twisting to remove

25  a suspect from a crashed getaway car was objectively reasonable even though the plaintiff asserted that

ORDER - 7

1   the officer's conduct rendered him paraplegic.  340 F.3d 787, 793 (9th Cir. 2003).  However, in <u>Chew</u>

2   the court found a genuine issue of material fact remained as to whether it was an excessive use of

3   force to use a canine unit to apprehend and repeatedly bite a suspect who had fled from police and

4   remained trapped in a scrapyard for several hours where he posed little threat to police or himself.

5   <u>Chew</u>, 27 F.3d at 1442.

6          The use of force by the three deputies against Plaintiff was objectively reasonable and therefore

7   constitutional.  The deputies did intrude upon Plaintiff's Fourth Amendment rights.  <u>See</u> <u>Graham</u>, 490

8   U.S. at 396.  However, the government's interest outweighs the gravity of the intrusion of Plaintiff's

9   Fourth Amendment rights.  <u>See</u> <u>id.</u>  The first <u>Graham</u> factor, the severity of the crime, favors the

10  government.  <u>See</u> <u>id.</u>  Plaintiff had attempted to assault his friend Wilson, the paramedics, and the

11  deputies, and he refused to comply with the deputies' orders.  The second and most important <u>Graham</u>

12  factor, weighs strongly in favor of the reasonableness of the government's intrusion on Plaintiff's

13  rights.  The deputies reasonably and objectively feared for their safety and Plaintiff's safety.  <u>See</u> <u>id.</u>

14  The third <u>Graham</u> factor also weighs in the government's favor, as Plaintiff actively and physically

15  resisted arrest.  <u>See</u> <u>id.</u>

16         The escalating use of force was proportional to and required by the situation facing the

17  deputies.  The deputies were called to help subdue a man who attempted to assault his friend and

18  paramedics.  He was a large man covered in blood in a small bathroom, who was incoherent, sweaty,

19  and violent.  When deputy Dawson arrived, he attempted to communicate with Plaintiff, but was met

20  with threatening gestures from Plaintiff.  Dawson's attempt to grab Plaintiff's hand was only after

21  Plaintiff had lunged at Dawson and made an attempt to grab the towel bar–a likely weapon.  Even

22  construing this fact in favor of Plaintiff (that he was merely trying to stabilize himself), the Court,

23  considering the totality of the circumstances, cannot second-guess the deputy's objectively reasonable

24  fear that Plaintiff would harm him.  <u>See</u> <u>Chew</u>, 27 F.3d at 1441.  Dawson's use of the Taser was

25  warranted by the circumstances to subdue the increasingly violent Plaintiff.  <u>See</u>, <u>e.g.</u>, <u>Jackson</u>, 268

F.3d at 652-53 (use of non-lethal chemical irritant to subdue plaintiff was reasonable).  Vafeados'

punches were reasonably necessary to control Plaintiff and avoid harm to the deputies.  See Eberle v.

City of Anaheim, 901 F.2d 814, 819-20 (9th Cir. 1990) (holding that use of a finger hold was

reasonable to control of a crowd); Blankenhorn v. City of Orange, 485 F.3d 463, 469 (9th Cir. 2007)

(neither tackling nor punching a suspect is necessarily excessive).  The use of hobbles was also

reasonably necessary to control Plaintiff's violent kicking.  See Blankenhorn, 485 F.3d at 469

(suggesting in some situations use of hobbles is necessary to take a person into custody).  Placing a

weight on Plaintiff's back was necessary to subdue him and was not objectively unreasonable in light

of the dangerous situation facing the deputies.  See id.

Plaintiff's contention that Dawson should not have used the Taser and that the officers should

have used a different method to subdue Plaintiff is misguided.  Plaintiff's expert suggests that the

deputies should have waited "until there were at least four and preferably five deputies on-scene to

engage and rapidly overpower [Plaintiff]."  (Van Blaricom Decl., Dkt. No. 37-8, at 9)  However, this

Court may not use perfect hindsight to second-guess what the deputies could have done differently,

even when considering alternative methods.[3]  Chew, 27 F.3d at 1440 (citing Graham, 490 U.S. at

396).   The deputies' use of force was objectively reasonable and constitutional.  The deputies are

entitled to qualified immunity at Saucier's first step.  See Jackson, 268 F.3d at 653.

**2. Unlawful Arrest**

Plaintiff alleges that the Defendant deputies arrested him without probable cause or a warrant

in violation of his Fourth Amendment rights.  Defendants responds that Plaintiff was never arrested

and that they detained Plaintiff only as part of the deputies' "community caretaking" function.

Alternatively, Defendants suggest that there was probable cause to arrest Plaintiff.  While Defendants

are correct that the arrest was not illegal, they are incorrect in asserting that Plaintiff was not arrested.

---

[3]There was also a need to administer immediate medical aid to Plaintiff, with paramedics
standing by.  Waiting for four or five deputies to arrive was not a reasonable alternative.

1   Although Plaintiff was arrested, the deputies legally seized Plaintiff as part of their "community

2   caretaking" function and had probable cause to arrest.

3          An arrest occurs when, considering all the circumstances, a reasonable person would not feel

4   free to leave.  See Michigan v. Chesternut, 486 U.S. 567, 573-5 (1988).  Under this definition the

5   Plaintiff was arrested.  He was restrained by three officers, who placed handcuffs and hobbles on him.

6   A reasonable person in Plaintiff's position would not feel free to leave.  See id.; Kaupp v. Texas, 538

7   U.S. 626, 629 (2003).[4]

8          The Supreme Court has recently reconfirmed that a warrantless entry into a home to assist

9   persons who "are seriously injured or threatened with such injury" does not run afoul of the Fourth

10  Amendment.  Brigham City, Utah v. Stuart, 547 U.S. 398, 126 S.Ct. 1943, 1947 (2006) (entry into

11  home to stop a fight not an illegal search); Mincey v. Arizona, 437 U.S. 385, 392 (1978).  Officers

12  performing a "community caretaking" function, providing protection in emergencies, may enter a

13  home without violating the Fourth Amendment.  See Brigham City, 126 S.C.t at 1947; Cady v.

14  Dombrowski, 413 U.S. 433, 441 (1973).  The Ninth Circuit has cast the "community caretaking"

15  function as the "emergency doctrine."  See United States v. Stafford, 416 F.3d 1068, 1073 (9th Cir.

16  2005) ("The emergency doctrine is based on and justified by the fact that, in addition to their role as

17  criminal investigators and law enforcers, the police also function as community caretakers.").[5]  Here, it

18  is clear that the deputies' entry into Goldsmith's home was justified to prevent injury to and to assist

19  the injured Plaintiff.  The entry was not illegal.  See Brigham City, 126 S.Ct. at 1947.

20

21          [4]The Court rejects Defendants' misguided and specious assertion that because Plaintiff has no
22  memory of the events he was not arrested.  This fails both logic and the well-established law requiring
    a court to examine the circumstances objectively, not merely subjectively.  See Kaupp, 538 U.S. at
23  629.

24          [5] While Brigham City altered the Ninth Circuit's construction of the "emergency doctrine," it
    did not overrule it as an exception to the Fourth Amendment's warrant requirement.  126 S.Ct. at
25  1947.

1    Brigham City did not make clear whether the "community caretaking" exception for entry and

2    search applies to warrantless arrests under the Fourth Amendment.  Nor has the Ninth Circuit

3    extended the "emergency doctrine," or "community caretaking," exception to warrantless arrests.

4    Other circuits, however, have held that the "community caretaking" function applies to arrests as well

5    as searches.  See United States v. Rideau, 949 F.2d 718, 720 (5th Cir. 1991) vacated on other

6    grounds, 969 F.2d 1572 (5th Cir. 1992); Winters v. Adams, 254 F.3d 758 (8th Cir. 2001); United

7    States v. King, 990 F.2d 1552, 1560-61 (10th Cir. 1993).

8        The Court finds reason to extend the "community caretaking" exception to the Fourth

9    Amendment to this situation.  The deputies, responding to the paramedics' request for help with a

10   violent, injured patient, briefly arrested Plaintiff for the sole purpose of enabling paramedics to render

11   necessary medical aid.  This fits squarely with the logic of Brigham City, where officers entered a

12   home to prevent injuries to party-goers during a melee.  126 S.Ct. at 1947.  The Court is also

13   persuaded by the reasoning and logic of the Fifth, Eighth, and Tenth Circuits, who have held that

14   arrests as part of an officer's "community caretaking" function are exceptions to the Fourth

15   Amendment's warrant requirement.  See supra.

16       Alternatively, the deputies had probable cause to arrest of Plaintiff without a warrant.  A

17   warrantless arrest is reasonable when officers have probable cause to believe the suspect is committing

18   a crime.  The Supreme Court has repeatedly held that reasonable suspicion must be based on specific,

19   articulable facts individualized to the particular suspect detained.  City of Indianapolis v. Edmond, 531

20   U.S. 32, 37 (2000) ("A search or seizure is ordinarily unreasonable in the absence of individualized

21   suspicion of wrongdoing.").  Probable cause exists where the totality of the circumstances suggest a

22   "fair probability" that the suspect has committed a crime.  See United States v. Stanton, 501 F.3d

23   1093, 1100 (9th Cir. 2007).  Armed with probable cause, an officer may arrest a citizen without a

24   warrant even if the offense is minor.  Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001).

25

ORDER - 11

1   The deputies had probable cause to arrest Plaintiff.  See Tatum, 441 F.3d at 1094-95 (holding

2   that plaintiff's kicking of a door, refusal to comply with commands, and likely use of drugs was

3   enough to establish probable cause).  Deputy Dawson had probable cause to arrest Plaintiff given the

4   circumstances.  Dawson believed Plaintiff was "having a bad reaction to a substance" and knew he had

5   threatened the paramedics.  Plaintiff disobeyed Dawson's commands to relax and submit to medical

6   care.  Plaintiff "assumed a fighting stance," and, according to Dawson, attempted to arm himself with

7   a metal bar.  It was at this point that Dawson attempted to restrain Plaintiff.  Dawson had probable

8   cause to believe that Plaintiff was resisting arrest, which is a misdemeanor.  RCW 9A.76.040.  The

9   circumstances also show a fair probability that Plaintiff attempted to assault a police officer, the

10  execution of which is a Class C felony.  RCW 9A.36.031(1)(g).  Moreover, Plaintiff was obstructing

11  Dawson's attempt to discharge his duties prior to arrest, which is a gross misdemeanor.  RCW

12  9A.76.020.

13  The Court finds that the arrest was constitutional either under the "community caretaking"

14  exception or, alternatively, under the probable cause exception to the Fourth Amendment.

15  **3. Due Process**

16  Plaintiff alleges violations of the Due Process Clause of the Fourteenth Amendment.

17  Defendants respond that the deputies' actions did not violate Plaintiff's procedural due process rights

18  and in their reply brief contend that Plaintiff waived this claim.  Although Plaintiff's argument is

19  spartan, it is not an outright waiver.  Regardless, Defendants did not violate Plaintiff's due process

20  rights.

21  Plaintiff cannot claim a violation of substantive due process.  Substantive due process analysis

22  is inappropriate when the claim is already "'covered by a specific constitutional provision, such as the

23  Fourth or Eighth Amendment . . . .'"  County of Sacramento v. Lewis, 523 U.S. 833, 843 (1998)

24  (quoting United States v. Lanier, 520 U.S. 259, 272 n.7 (1997)).  Plaintiff's claim is covered by the

25

ORDER - 12

1   Fourth Amendment; he was seized by officers. The Court may only examine Plaintiff's claim in light

2   of the procedural due process guarantees under the Fourteenth Amendment. See id.

3       A § 1983 claim based upon procedural due process has three elements: "(1) a liberty or

4   property interest protected by the Constitution; (2) a deprivation of the interest by the government;

5   and (3) lack of process." Portman v. County of Santa Clara, 995 F.2d 898, 904 (9th Cir. 1993). The

6   "the core of the concept" of procedural due process is the "protection against arbitrary action."

7   Lewis, 523 U.S. at 845. "[O]nly the most egregious official conduct can be said to be 'arbitrary in the

8   constitutional sense.'" Id. at 846 (quoting Collins v. City of Harker Heights, Tex., 503 U.S. 115, 129

9   (1992)).

10      Plaintiff has satisfied all three requisite elements to establish a procedural due process claim.

11  See Portman, 995 F.2d at 904. Plaintiff was deprived his liberty interest by the government with little

12  or no process. However, Defendants' conduct cannot be reasonably described as egregious or

13  shocking. See Lewis, 523 U.S. at 845. The deputies confronted Plaintiff only after being summoned

14  by paramedics who desired to assist Plaintiff, but could not because of his violent behavior. The use

15  of force, as described above, was proportional to the need to subdue Plaintiff and permit paramedics

16  to treat him. It was not shocking to the conscious or arbitrary. But see Rochin v. California, 342 U.S.

17  165, 210 (1952) (holding that forcible stomach pumping to recover evidence was egregious and

18  arbitrary).

19  **C. Municipal Liability**

20      Plaintiff contends that the County has a policy or custom of not training its officers in how to

21  deal with both positional asphyxia and excited delirium. Plaintiff argues two points. First, he contends

22  that the deputies who dealt with Plaintiff were inadequately trained because the County does not train

23  deputies in excited delirium or positional asphyxiation. Second, Plaintiff contends that the County was

24  deliberately indifferent to his rights because a pattern of unconstitutional conduct towards persons

25  suffering from excited delirium and positional asphyxia exists.

ORDER - 13

1    Defendants respond that Plaintiff has not shown that the County's deputies were improperly

2    trained such that the County demonstrated "deliberate indifference" to Plaintiff's rights.  In their reply

3    brief, Defendants assert that the County does train its officers regarding positional asphyxia and

4    excited delirium, and that the deputies at the scene had knowledge of that information.  Defendants

5    rely in part on a declaration submitted for the first time with their reply brief.[6]  The declaration

6    includes exhibits of power-point type slides that the County uses to train its deputies on positional

7    asphyxia and excited delirium.  (Dkt. Nos. 40-2 & 40-3).  Plaintiff did not object to the declaration and

8    has waived a challenge to its admissibility.  See Fed. Deposit Ins. Corp. v. New Hampshire Ins. Co.,

9    953 F.2d 478, 485 (9th Cir. 1991); Fed. R. Civ. P. 12(f)(2) (a motion to strike must be made within 20

10   days of being served with the pleading).  The Court finds no reason to strike these materials.

11   Defendants are entitled to qualified immunity.

12    The Supreme Court has held that "the inadequacy of police training may serve as the basis for

13   § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of

14   persons with whom the police come into contact."  City of Canton, Ohio v. Harris, 489 U.S. 378, 388

15   (1989).  Plaintiff must demonstrate that a particular municipal policy or custom was the "moving

16   force of [the] constitutional violation" and harm suffered.  Monell v. Dept. of Soc. Servs. of City of

17   New York, 436 U.S. 658, 694 (1978); see City of Canton, 489 U.S. at 390.  A policy is "'a deliberate

18   choice to follow a course of action . . . made from among various alternatives by the official or

19   officials responsible for establishing final policy with respect to the subject matter in question.'"

20   Fairley v. Luman, 281 F.3d 913, 918 (9th Cir. 2002) (per curiam) (citation omitted).  However,

21   "[o]nly where a municipality's failure to train its employees in a relevant respect evidences a

22   'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of

23   _____

24    [6]Plaintiff did not make specific reference to excited delirium or positional asphyxia in his
     complaint.  Plaintiff made this argument for the first time in his response to Defendants' motion for
25   summary judgment.

ORDER - 14

1    as a city 'policy or custom' that is actionable under § 1983." <u>City of Canton</u>, 489 U.S. at 389.  A

2    municipality "cannot be held liable solely because it employs a tortfeasor" or "on a <u>respondeat</u> <u>superior</u>

3    theory." <u>Monell</u>, 436 U.S. at 691.

4           In <u>Board of County Comm'rs of Bryan County, Okl. v. Brown</u>, the Supreme Court discussed

5    three ways in which a county may be liable for inadequate training.  520 U.S. 397 (1997).  The first is

6    a deficient training program "intended to apply over time to multiple employees."  <u>Id.</u> at 407 (citation

7    omitted).  The continued adherence by policymakers "to an approach that they know or should know

8    has failed to prevent tortious conduct by employees may establish the conscious disregard for the

9    consequences of their action–the 'deliberate indifference'–necessary to trigger municipal liability."  <u>Id.</u>

10   (citation omitted).  Second, a municipality may be liable if there is "the existence of a pattern of

11   tortious conduct by inadequately trained employees" that is the "'moving force' behind plaintiff's

12   injury."  <u>Id.</u> at 407-08 (citation omitted).  However, plaintiff must show more than simply "a one-time

13   negligent administration of the program or factors peculiar to the officer involved in a particular

14   incident."  <u>Id.</u> at 408.  Third, a plaintiff may prove a failure-to-train claim without showing a pattern of

15   constitutional violations where "a violation of federal rights may be a highly predictable consequence

16   of a failure to equip law enforcement officers with specific tools to handle recurring situations."  <u>Id.</u> at

17   409.

18          Plaintiff has not demonstrated a genuine issue of material fact as to whether the County acted

19   with deliberate indifference.  <u>See</u> <u>Monell</u>, 436 U.S. at 694.  First, the County trains all of its deputies

20   to use a "force continuum," to ensure that only reasonable and proportional force is used.  The County

21   also trains its deputies of the risk of positional asphyxia and excited delirium.[7]  These policies do not

22

23          [7]Deputy Timothy Durand, a trainer in the County's Organizational Development Division,
     teaches deputies about excited delirium and other "sudden unexpected death" syndromes.  (Durand
24   Decl., Dkt. No. 40, at 2)  Durand also teaches deputies about the risks associated with Tasers and
     excited delirium.  (<u>Id.</u>)  The County has a specific policy regarding positional asphyxia that informs
25   deputies never to hog-tie suspects (i.e., attaching a hobble cord to handcuffs behind a suspect's back).

1   demonstrate inadequacy rising to the level of deliberate indifference.  Second, Plaintiff has not

2   produced facts suggesting that a pattern of tortious conduct by County deputies exists.  See Brown,

3   520 U.S. at 407-08.  Plaintiff's expert states, without supporting information, that the County "was

4   directly involved in one of the first recorded excited delirium and restraint asphyxia deaths

5   nationwide–Scarsella in 1986."  (Dkt. 37-8, Van Blaricom Decl. at 8)  This is insufficient to create a

6   genuine issue of material fact that a pattern of tortious conduct by County deputies exists that can

7   amount to deliberate indifference.  Moreover, the County cannot be held liable "solely because it

8   employs a tortfeasor."  Monell, 436 U.S. at 691.  Lastly, there is no evidence that officers encountered

9   a highly predictable situation without proper training.  See Brown, 520 U.S. at 407-09.  Although the

10  officers had varying levels of information regarding excited delirium and positional asphyxia, there are

11  no facts in the record showing that this was "a highly predictable" or "recurring situation[]."  See id. at

12  409 (suggesting that the need for more training must be "obvious").

13          The Court grants Defendants' motion as to Plaintiff's claims against the County.

14  **D.  State Qualified Immunity**

15          Plaintiff alleges that Defendants' actions constitute assault and battery, false imprisonment, and

16  false arrest. Defendants respond that they are entitled to state law qualified immunity and that all

17  actions of which Plaintiff complains were lawful.  Defendants are entitled to qualified immunity.

18          State law qualified immunity rests on a different analysis than does qualified immunity under 42

19  U.S.C. § 1983.  See Staats v. Brown, 139 Wn.2d 757, 779 (2000).  State law qualified immunity bars

20  suits against officers for false arrest, false imprisonment, and assault and battery when the officer "(1)

21  carries out a statutory duty, (2) according to procedures dictated to him by statute and superiors, and

22  (3) acts reasonably."  Guffey v. State, 103 Wn.2d 144, 152-53 (1984), impliedly overruled on other

23  grounds, Babcock v. State, 116 Wn.2d 596, 620 (1991).  Washington does not permit qualified

24  

25  (Id.)

1    immunity from claims of assault and battery where police used excessive force.  See Staats, 139

2    Wn.2d at 780.

3             The deputies are entitled to qualified immunity from Plaintiff's false arrest and imprisonment

4    and assault and battery claims.[8]  First, the officers were acting pursuant to their general role of

5    enforcing the state criminal code.  See RCW 10.93.070; Staats, 139 Wn.2d at 778.  Second, the

6    deputies were acting pursuant to guidelines regarding the reasonable use of force to subdue a suspect

7    who violates the criminal code.  Staats, 139 Wn.2d at 778.  The deputies had probable cause to arrest

8    Plaintiff.  See supra, Section B.2.  Third, the officers acted reasonably to subdue Plaintiff in order to

9    permit paramedics to administer medical care.  Staats, 139 Wn.2d at 778.  The Court finds that the

10   deputies are entitled to state law qualified immunity in regards to Plaintiff's false arrest, false

11   imprisonment, and assault and battery claims.

12            Even if qualified immunity did not attach, Defendants are still not liable.  Under Washington

13   law, false arrest or false imprisonment is "the unlawful violation of a person's right of personal liberty

14   or the restraint of that person without legal authority."  Bender v. City of Seattle, 99 Wn.2d 582, 591

15   (1983).  As detailed above, see supra, Section B.2, the deputies had legal authority to restrain Plaintiff.

16   Because the restraint was lawful, Plaintiff's claims for false arrest and imprisonment fail.  Similarly,

17   because the touching was lawful and therefore privileged, Plaintiff's claim for assault and battery is

18   without merit.  See McKinney, 103 Wn. App. at 409.

19   **E.      Negligence**

20            Plaintiff contends that the deputies acted negligently.  Defendants respond that Plaintiff has not

21   produced any facts supporting two essential elements his claim: duty and breach.

22

23   _____

24            [8]The absence of excessive use of force permits Defendants to claim qualified immunity from
     Plaintiff's assault and battery claim.  See McKinney v. City of Tukwila, 103 Wn. App. 391, 408-09, 13
25   P.3d 631 (2000).

ORDER - 17

Negligence under Washington law requires proof of "(1) the existence of a duty to plaintiff; (2) breach of that duty; (3) resulting injury; and (4) proximate cause between the breach and the injury." Hutchins v. 1001 Fourth Ave. Assocs., 116 Wn.2d 217, 220 (1991).  An individual officer owes only a general duty of care to perform her duties as reasonable peace officer of ordinary prudence under the circumstances.

Plaintiff has failed to show any disputed, genuine material facts establishing that the deputies breached their general duty of care owed to Plaintiff.  The deputies arrived to provide assistance to Plaintiff so that he could received medical care.  The deputies did so and Plaintiff received medical care.  The deputies merely performed their jobs as a reasonable deputy would have done in similar circumstances.  The deputies performed their general duties and breached no duty to Plaintiff.

**F.     Negligent Supervision And Retention**

Plaintiff's complaint alleges that the County negligently supervised and retained its deputies. Defendants respond that Plaintiff presents no evidence to support this claim.

An employer has "a limited duty to control an employee for the protection of third parties, even where the employee is acting outside the scope of employment."  Niece v. Elmview Group Home, 131 Wn.2d 39, 51 (1997).  To prove negligent supervision, Plaintiff must show that: (1) the employee acted outside the scope of his employment; (2) the employee presented a risk of harm to other employees; (3) the employer know or should have known that the employee posed a risk to others; and (4) the employer's failure to supervise was the proximate cause of the injuries.  Id.  A claim for negligent retention requires Plaintiff to prove that the County retained the deputies and knew or should have known that they were incompetent or unfit.  Peck v. Siau, 65 Wn. App. 285, 288, 827 P.2d 1108 (1992).

Plaintiff's claims for negligent supervision and retention are without factual support.  Plaintiff points to no facts that suggest that the deputies acted outside of the scope of their employment or that the County failed to properly train its employees, see supra Section C.  Defendants followed County

1    policy in their interaction with Plaintiff.  (See Dawson Decl. at ¶¶ 3, 4, 20, 26; Kahler Decl. at ¶¶ 2,

2    15; Vafaedos Decl. at ¶¶ 3, 11, 16)  Plaintiff has also failed to offer any facts suggesting the deputies

3    were incompetent or unfit for their jobs.  The County cannot be liable for negligent retention.  See

4    Peck, 65 Wn. App. at 288.

5    **G.      Outrage and Negligent Infliction of Emotion Distress**

6          Plaintiff contends that the deputies committed the tort of outrage and negligent infliction of

7    emotional distress.  Defendants respond that Plaintiff cannot show that the deputies' conduct was

8    outrageous and therefore sufficient to prove outrage.  Further, Defendants assert that Plaintiff has not

9    presented sufficient facts that he suffered objective symptoms of emotional distress required to prove

10   negligent infliction of emotion distress.  Defendants are not liable on either claim.

11         Outrage requires Plaintiff to demonstrate: (1) extreme and outrageous conduct; (2) intentional

12   or reckless infliction of emotional distress; and (3) actual result to the plaintiff of severe emotional

13   distress.  Rice v. Janovich, 109 Wn.2d 48, 61 (1987). Liability for outrage exists only where the

14   defendant's conduct is "so outrageous in character, and so extreme in degree, as to go beyond all

15   possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized

16   community."  Grimsby v. Samson, 85 Wn.2d 52, 59 (1975).  The deputies' conduct was not

17   outrageous or extreme.  Rather, the deputies arrived on scene to help Plaintiff receive medical

18   attention.  Their use of force was proportional to the need to subdue Plaintiff, who was violent and

19   physically threatening to both the paramedics and officers.  The deputies' attempts to help Plaintiff

20   cannot be said to be "intolerable in a civilized community."  Id.

21         Negligent infliction of emotional distress requires a demonstration of duty, breach, proximate

22   cause, and damages.  Hunsley v. Giard, 87 Wn.2d 424, 434 (1976).  A claim for the negligent

23   infliction of emotional distress also requires that the emotional distress "is manifested by objective

24   symptoms."  Haubry v. Snow, 106 Wn. App. 666, 678-79, 31 P.3d 1186 (2001).  To prove the

25

1   objective symptomatology requirement, the emotional distress "must be susceptible to medical

2   diagnosis and proved through medical evidence."  Id. (citing Hunsley, 87 Wn.2d at 436).

3        Plaintiff has not demonstrated that the emotional distress is manifest by objective symptoms.

4   Rather, Plaintiff points only to the fact that he has sought counseling from a psychiatrist and that his

5   pre-existing anxiety disorder has been aggravated by the incident.  Plaintiff has not offered any facts

6   that this Court can construe in his favor to satisfy the requirement that he show objective symptoms

7   and an actual medical diagnosis.  See Kloepfel v. Bokor, 149 Wn.2d 192, 196-97 (2003) (medical

8   evidence is required to prove emotional distress).

9                                    **Conclusion**

10       Plaintiff has failed to demonstrate the existence of any genuine issues of material fact

11  precluding this Court from granting Defendants' summary judgment motion.  Defendants' motion is

12  GRANTED and all of Plaintiff's claims are DISMISSED WITH PREJUDICE.

13       The Clerk is directed to send copies of this order to all counsel of record.

14       Dated:  February 15, 2008

15

16

17                                          Marsha J. Pechman
                                            U.S. District Judge
18

19

20

21

22

23

24

25

ORDER - 20